STEVEN G. KALAR
Federal Public Defender
Northern District of California
ANGELA CHUANG
Assistant Federal Public Defender
19th Floor Federal Building - Box 36106
450 Golden Gate Avenue
San Francisco, CA 94102
Telephone:   (415) 436-7700
Facsimile:    (415) 436-7706
Email:         Angela_Chuang@fd.org

Counsel for Defendant Rodriguez

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JOSE RODRIGUEZ,<br><br>Defendant. | **Case No.:** CR 19–279 CRB<br><br>**REPLY BRIEF IN SUPPORT OF DEFENDANT'S MOTION TO SUPPRESS**<br><br>**Court:**          Courtroom 6, 17th Floor<br>**Hearing Date:**  October 16, 2019<br>**Hearing Time:**  1:30 p.m. |

**ARGUMENT**

**I.    The Government Has Failed To Meet Its Burden To Prove That There Was Reasonable Suspicion To Justify The Frisk Of Mr. Rodriguez**

In its opposition to Mr. Rodriguez's motion to suppress, the government asserts that the frisk of Mr. Rodriguez was lawful based on the combination of four main factors: (1) the location and time of day; (2) Mr. Rodriguez's lack of identification on his person; (3) a never-before-mentioned bulge in Mr. Rodriguez's sweatshirt pocket; and (4) Mr. Rodriguez's momentary placement of his hands in the outer edge of his pocket. Dkt. No. 20 at 9–11. Certainly, the government is correct when it describes the *Terry* frisk analysis as one that should take into account the totality of the circumstances; however, the relative weight or strength of each individual factor clearly plays into a totality of the circumstances analysis, and each factor therefore must be examined to determine its significance. When taken altogether, the factors in Mr. Rodriguez's case do not even come close to establishing the requisite reasonable suspicion that Mr. Rodriguez was armed and dangerous. In its attempt to justify patently unlawful police conduct, the government stretches the *Terry* doctrine beyond its breaking point.

**A.    The location and time of day are not particularized facts regarding the likelihood that Mr. Rodriguez, specifically, was armed and dangerous**

The Ninth Circuit has cautioned courts to scrutinize police officers' conclusory assertions and evaluate whether they are supported by an objective basis in fact. A conclusory allegation, without foundational facts, is akin to an anonymous tip and consequently is entitled to little weight. *United States v. Cervantes*, 703 F.3d 1135, 1139 (9th Cir. 2012) (citing *United States v. Thomas*, 211 F.3d 1186, 1189–90 (9th Cir. 2000). An en banc panel of the Ninth Circuit addressed a similar assertion that a crime occurred in an allegedly high crime neighborhood in *United States v. Montero-Camargo*, 208 F.3d 1122, 1138–39 (9th Cir. 2000) (en banc). The *Montero-Camargo* Court held: "[M]ore than mere war stories are required to establish the existence of a high-crime area. As we have stated in the text, courts should examine with care the specific data underlying such assertion." *Id.* at 1138 n.2.

The government first points to the fact that this stop occurred "late at night in an area within the Tenderloin that, based on their training and experience in patrolling the Tenderloin at night, the officers knew to be a particularly high-crime area of San Francisco with relatively greater numbers of

1   narcotics-related and violent offenses." Dkt. No. 20 at 9. To support this contention, Officers Murphy

2   and Shaini both submitted declarations containing essentially the same sentence, but phrased slightly

3   differently. *See* Declaration of Officer James T. Shainy ("Shaini Decl."), Dkt. 20-1, ¶ 5; Declaration

4   of Officer John F. Murphy ("Murphy Decl."), Dkt 20-2, ¶¶ 6–7. Officer Murphy elaborates further by

5   listing various types of weapons and various types of violence that he has encountered in the

6   Tenderloin. Murphy Decl. ¶¶ 6–7. These assertions are unsupported by any statistical analysis or

7   objective data, placing them squarely in the category of "mere war stories" that are inadequate to

8   "establish the existence of a high-crime area." *Montero-Camargo*, 208 F.3d at 1138 n.2; *see United*

9   *States v. Harger*, 313 F. Supp. 3d 1082, 1094 (N.D. Cal. 2018) (assertion by officer, who had

10  patrolled the area for several years, that he "knows" that the Bayview–Hunters Point area is a

11  "narcotics-prone and violent crime-prone area" provided "no factual basis to support a belief that the

12  area...is particularly crime-ridden.").[1]

13      What is noticeably lacking, however, from the litany of horribles in the officers' declarations **is**

14  **any connection to Mr. Rodriguez in particular**. Broad generalizations about the crime rate in a

15  particular neighborhood, with no nexus to a specific person, cannot provide a basis for a frisk.  There

16  is no indication that Officers Shaini and Murphy were responding to any such reports or complaints

17  when they stopped Mr. Rodriguez, nor did they have any reason to suspect that he was engaged in

18  such behavior; after all, as the government concedes, the only reason for the stop was a scooter

19  infraction. Dkt. No. 20 at 1–2. Even if the officers' conclusory assertions were sufficient as a factual

20  basis to find that an area is high crime and prone to weapons-related crimes, which they are not,

21  *Terry* still "requires reasonable, individualized suspicion before a frisk for weapons can be

22  conducted." *Montero-Camargo*, 208 F.3d at 1138 (quoting *Maryland v. Buie*, 494 U.S. 325, 334 n.2

23  (1990)); *see Ybarra v. Illinois*, 444 U.S. 85, 94 (1979) (holding that *Terry* does not permit a frisk for

24  _____

25  [1] Furthermore, the first time either officer mentions that violent and/or weapons-related incidents
    occur with any frequency in the area is in these declarations that were sworn to on September 30,
26  2019, nearly 8 months after the incident. Significantly, their original police reports mention nothing
    of the sort: (1) Officer Shaini's report merely states that he and Officer Murphy respond to the area
27  "nightly regarding people loitering, selling drugs and using drugs," and does not assert that the
    Tenderloin is prone to violent crimes, Declaration of Angela Chuang in Support of Motion to
28  Suppress ("Chuang Decl."), Dkt. No. 16, Ex. A at 1121; and (2) Officer Murphy's report says
    nothing about the crime rate in the Tenderloin, Chuang Decl., Dkt. No. 16, Ex. A at 1126.

DEF.'S MOTION TO SUPPRESS REPLY
*RODRIGUEZ*, CR 19–279 CRB

weapons in the absence of reasonable belief or suspicion **directed at the person to be frisked**).

Otherwise, police officers would have blanket authority to seize and frisk any person who happens to

live or even merely pass through that particular neighborhood, a phenomenon that would

demonstrably and blatantly violate the Fourth Amendment.

The government's discussion of this factor relies heavily on *United States v. Waldron*, 2 Fed.

Appx. 752 (9th Cir. 2001) (unpublished), an unpublished opinion that lacks precedential value. In

*Waldron*, the Court was presented with an array of facts that stand in clear contrast to those in the

instant case—namely, the police officer in *Waldron* saw the defendant counting crack rocks in the

middle of the night in an isolated location, and the officer testified to the link between possession of

narcotics and possession of a firearm. *Id.* at 754. No such link exists here between riding a scooter

and possession of a weapon.[2] Considering the distinctions between the two situations, as well as the

fact that the government has failed to produce objective data to support conclusory assertions about

the neighborhood, this factor is decidedly weak at best.[3]

### B.    Mr. Rodriguez's lack of identification on his person does not contribute to reasonable suspicion that he was armed and dangerous

It is telling that the government did not cite to a single case where a court found that an

individual's lack of identification somehow increased the chance that he/she was armed and

dangerous, as there is no rational link between the two. Additionally, Mr. Rodriguez did not refuse to

produce identification in a way that arguably would have been suspicious or combative; rather, he

told the officers that his ID was in his car down the street. *See* Shaini Decl. ¶ 13. Moreover, unlike

when an individual is driving a car, and therefore required to carry an ID, there was nothing unlawful,

let alone suspicious or related to dangerousness, about Mr. Rodriguez not having ID on his person.

### C.    There was no bulge in Mr. Rodriguez's pocket, and being normally dressed does not give rise to reasonable suspicion that someone is armed and dangerous

"[T]hat a person is normally dressed does not give rise to reasonable suspicion the person is

---

[2] It also bears noting that the defendant in *Waldron* conceded that he was in a high-crime area, *see id.*, while Mr. Rodriguez concedes no such thing.

[3] One is hard pressed to imagine a stop for an offense less likely to be linked to being armed and dangerous than riding a scooter on a sidewalk. As such, the government is suggesting that given the "high crime area," someone stopped for even the most minor of offenses is subject to a frisk. That is, of course, contrary to the law.

armed and dangerous. Otherwise, innumerable college students everywhere could be frisked for weapons on appearance alone." *Thomas v. Dillard*, 818 F.3d 864, 884 (9th Cir. 2016). Even clothing that is bulky or that is capable of hiding a weapon is insufficient to provide reasonable suspicion that a person is armed and dangerous. *See Ybarra*, 444 U.S. at 93 (holding that there was no reason to believe a bar patron was armed where he was wearing a heavy lumber jacket); *Thomas*, 818 F.3d at 884 ("We acknowledge that such clothing [an untucked T-shirt and jeans, capable of hiding a weapon] would do nothing to *dispel* the notion that Thomas was armed, but neither does it suggest that he was armed."). When Mr. Rodriguez was stopped, he was wearing a hooded sweatshirt, entirely appropriate attire for a February night in San Francisco. Nothing about Mr. Rodriguez's clothing suggested that he was armed and dangerous.

Officer Shaini claims in his declaration—for the very first time—that he "noticed a bulge of an unknown item in [Mr. Rodriguez's] front sweatshirt pocket." Shaini Decl. ¶ 15. This assertion raises serious questions as to Officer Shaini's credibility; not only is his original report, which includes a narrative detailed enough to fill two single-spaced pages, devoid of any mention of a bulge, but Officer Murphy's report and declaration also do not ever describe a bulge. *See* Chuang Decl., Ex. A; Murphy Decl. ¶¶ 11–15. These two police officers both graduated from the Academy, where they undoubtedly received training in how to write thorough reports, and they presumably write reports regularly as part of their jobs. Through their training and experience, much touted in their declarations, they surely must have known the possible significance of a suspicious bulge in someone's clothing during a street encounter, and would not have left it out of their original reports if it truly existed. No reports or paperwork ever reference this alleged bulge except for Officer Shaini's declaration submitted in response to Mr. Rodriguez's motion to suppress; this strongly suggests that the officers did not see a bulge—or, as is Mr. Rodriguez's position, there was no bulge—and that this detail was added recently in an attempt to retroactively justify unlawful conduct. Even more concerning is the fact that both officers' body camera footage clearly show that Mr. Rodriguez is a slightly overweight man wearing a relatively fitted sweatshirt **with no bulge to be seen**. Chuang Decl., Ex. B1 at 07:25:12–07:25:50; Chuang Decl., Ex. B2 at 07:25:15–07:25:50; *see* Image 1, Image 2 *infra*. If the Court does not agree that the body camera footage does not show a bulge, Mr.

1    Rodriguez requests an evidentiary hearing to address these substantial credibility issues.[4]



Image 1. Still from Chuang Decl., Ex. B2 at 07:25:50.



[4] The discussion about the officers' gloves raises further questions. Both officers attest in their declarations that it is their regular practice to put on gloves essentially every time they interact with someone. *See* Shaini Decl. ¶ 12; Murphy Decl. ¶ 11. Officer Murphy further states that "putting on gloves is a common practice of law enforcement officers." Murphy Decl. ¶ 11. Officers Shaini and Murphy's claims about why they put on gloves strain credulity and beg the question: Since they stopped Mr. Rodriguez for a scooter infraction, why would they immediately think that would lead to enough physical contact that gloves would be necessary? Interestingly enough, body camera footage from other officers who responded to the scene show that nearly every other officer did not put on gloves. *See* Declaration of Angela Chuang in Support of Motion to Suppress Reply ("Chuang Reply Decl."), Ex. C1 at 07:27:17–07:41:30; Chuang Reply Decl., Ex. C2 at 07:30:00–07:31:30. The other officers who do put on gloves only do so just prior to searching either Mr. Rodriguez, Chuang Reply Decl., Ex. C1 at 07:27:35–07:31:58, or the civilian witness who was also arrested, Chuang Reply Decl., Ex. C3 at 07:33:20–07:37:05. This indicates that putting on gloves is something officers do when they are going to search someone.

DEF.'S MOTION TO SUPPRESS REPLY
*RODRIGUEZ*, CR 19–279 CRB

Image 2. Still from Chuang Decl., Ex. B1 at 07:25:16.

### D.  Mr. Rodriguez's casual, split-second placement of his hands in the edge of his pocket does not give rise to reasonable suspicion that he was armed and dangerous

Touching of clothing and moving one's hands out of sight is insufficient justification for a *Terry* frisk. *See United States v. I.E.V.*, 705 F.3d 430, 438 ("[W]e join with our sister circuits that have refused to allow police officers to justify a *Terry* search based on mere nervous or fidgety conduct and touching of clothing."); *United States v. Ortiz*, 54 F.Supp.3d 1081, 1090–92 (N.D. Cal. 2014) (holding that frisk was unjustified even where defendant moved his hands out of the police officer's sight two or three times against orders). To go beyond that, even putting one's hands **into** pockets does not amount to reasonable suspicion for a frisk, particularly when that action occurs in an innocuous manner. *See United States v. Williams*, 731 F.3d 678, 688–89 (7th Cir. 2013) ("The simple fact that one's hands are in one's pockets . . . is of little value . . . . This does not change in high crime neighborhoods.").[5] When a person immediately removes his hands from his pockets upon an officer's request, that "sort of compliant behavior is not the makings of reasonable suspicion that a person is armed and dangerous." *Id.* at 690.

The government argues that Mr. Rodriguez placing his hands in the outer edge of his pocket created a concern that he possessed a weapon. Dkt. No. 20 at 9–10. At the outset, Mr. Rodriguez takes issue with the government's characterization of this movement as "reaching for" something. In fact, the body camera footage shows that this gesture was a normal, casual movement where he rested his hands in the outer edge of his pocket, much like many people ordinarily might do—even somewhat subconsciously—during conversations.[6] *See* Chuang Decl., Ex. B1 at 07:25:38–07:25:41. The footage makes clear that he was not grabbing at or reaching for anything. *Id.* Mr. Rodriguez's hands were in the edge of his pocket for essentially one second and he immediately removed his hands when ordered to by Officer Shaini. *Id.* This is precisely the "sort of compliant behavior" that

---

[5] The *Williams* Court went on to state, "We cannot support a rule that seemingly would allow those people who typically spend time in "low crime" areas (read: more affluent areas of town) to walk around with hands pocketed at night while not being subject to search, while depriving people in higher crime areas of that same ability." *Williams*, 731 F.3d at 689.

[6] As aptly put in *Williams*, "Certain people prefer their hands to be pocketed—and why not? It can often be more comfortable." *Williams*, 731 F.3d at 689.

did not give rise to reasonable suspicion in *Williams*, and the reasoning is no less true here. *See also*

*United States v. Ford*, 333 F.3d 839, 842, 845 (7th Cir. 2003) (finding no reasonable suspicion where

the defendant, in a high-crime area, "appeared nervous, looked around, stepped backward and

reached for his pocket after he activated [a] metal detector"). The government's position is further

undermined by the fact that neither officer appears particularly concerned in the footage leading up to

the frisk, *see* Chuang Decl., Ex. B1 at 07:25:12 – 07:25:50, and by Officer Shaini's statement about

the reason for the frisk ("I'm gonna pat you down real fast. While we talk, I need to find your ID"),

Chuang Decl. Ex. B2 at 07:25:49–07:25:54.

**II.    The Backpack Search Was Not A Search Incident to Arrest**

The items in the backpack, along with all other evidence recovered from his person and from

the ground, must be suppressed as fruits of an unlawful frisk. *Wong Sun v. United States*, 371 U.S.

471, 488 (1963). Should the Court find that the frisk was lawful, it should nonetheless conclude that

government's argument that the backpack search was not a lawful search incident to arrest.[7]

Once a person has been arrested, and police officers are in exclusive control of that person's

personal property, a warrantless search of that property violates the Fourth Amendment. *United*

*States v. Chadwick*, 433 U.S. 1, 15–16 (1977) (holding that a warrantless search of the defendant's

footlocker after defendant was securely in custody was unlawful), abrogated on other grounds by

*California v. Acevedo*, 500 U.S. 565 (1991). The narrow exception for a search incident to arrest

allows for a contemporaneous search of items reasonably within the person's reach in order to

prevent the possibility of that person destroying evidence or accessing a weapon, and is even

narrower when that person is securely in custody. *See Arizona v. Gant*, 556 U.S. 332, 339 (2009);

*Chimel v. California*, 395 U.S. 752, 768 (1969).

Here, Mr. Rodriguez had been handcuffed, fully subdued, seated on the sidewalk facing away

from his backpack (which was out of his reach), and surrounded by multiple police officers by the

---

[7] With regard to the inevitable discovery argument, the government has failed to demonstrate that the hypothetical inventory search "would have been discovered inevitably by lawful means." *United States v. Andrade*, 784 F.2d 1431, 1433 (9th Cir. 1986). The officers never would have had access to the backpack but for the unlawful frisk. Moreover, the government has neglected to provide sufficient proof or documentation establishing the contours of a proper inventory search. *See United States v. Collier*, No. EDCR 13-19 JGB, 2015 WL 11123302 at *10–*12 (C.D. Cal. Nov. 10, 2015) (

1   time Officer Shaini unzipped and searched the backpack. *See* Chuang Decl., Ex. B2 at 07:27:20–

2   07:34:34. As the government correctly notes, it is "highly relevant" and "significant" that Mr.

3   Rodriguez was handcuffed and seated on the ground. *See* Dkt. No. 20 at 13; *United States v. Cook*,

4   808 F.3d 1195, 1199 (9th Cir. 2015). However, the government errs in its conclusion that the

5   outcome in *Cook* should control here, as the distinctions between the two scenarios are striking. In

6   *Cook*, the officer searched the backpack immediately after arriving at the scene, "as Cook was being

7   taken into custody," *Cook*, 808 F.3d at 1200, whereas in the instant matter, Officer Shaini waited

8   seven minutes after the arrest. *See* Chuang Decl., Ex. B2 at 07:27:20–07:34:34. In *Cook*, the

9   "backpack was right next to [the defendant]," *Cook*, 808 F.3d at 1200, whereas in the instant matter,

10  Mr. Rodriguez's backpack was several feet behind him and a police officer—not Shaini—was

11  standing directly in the way. *See* Chuang Reply Decl., Ex. C2 at 07:33:38–07:33:45.



Image 3. Still from Chuang Reply Decl., Ex. C2 at 07:33:43.

22          Body camera footage showing the time period between when Mr. Rodriguez was cuffed and

23  when Officer Shaini searched the backpack, Chuang Reply Decl., Ex. C2 at 07:30:00–07:34:35,

24  contradicts the government's assertion that this search was justified by "reasonable safety concerns

25  and the reasonable possibility that the defendant 'could break free and reach for a backpack next to

26  him.'" Dkt. No. 20 at 13 (quoting *Cook*, 808 F.3d at 1199, 1200). The relaxed demeanor of the

27  numerous officers visible in this clip—many of them, including Officer Shaini, are seen standing

28  around and chatting—demonstrate that there was no longer any concern that Mr. Rodriguez was a

1    danger or that he would attempt to reach his backpack. The lack of concern that Mr. Rodriguez would

2    be able to reach for anything is further buttressed by the fact that Officer Shaini starts to pick up some

3    baggies of drugs from the ground, then stops and apparently decides that it is safe to leave the other

4    baggies scattered even closer to Mr. Rodriguez than where the backpack is sitting. Chuang Reply

5    Decl., Ex. C2 at 07:30:10–07:33:45. As previously noted, one officer stood right behind Mr.

6    Rodriguez, which placed him right between Mr. Rodriguez and the backpack. *Id.* at 07:33:43. It

7    would have been incredibly difficult, if not impossible, for Mr. Rodriguez to access anything in his

8    backpack in this scenario—not only would he have had to somehow break free from his handcuffs,

9    but he also would have had to somehow get past the officer standing behind him as well as Officer

10   Shaini (who is next to the backpack), while also avoiding the 7–8 other officers who were nearby.

11   Unlike *Cook*, there simply was no reasonable possibility that Mr. Rodriguez could break free and

12   reach his backpack. As such, the search of the backpack was not a lawful search incident to arrest.

13                                              **CONCLUSION**

14        For the reasons stated above, Mr. Rodriguez respectfully requests that the Court suppress all

15   fruits of the warrantless search of his person and backpack, or alternatively, to order an evidentiary

16   hearing to resolve any material factual disputes.

17

18

19        Dated:      October 9, 2019                    Respectfully submitted,

20                                                       STEVEN G. KALAR
                                                         Federal Public Defender
21                                                       Northern District of California

22                                                              /S

23                                                       ANGELA CHUANG
                                                         Assistant Federal Public Defender

24

25

26

27

28